**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ASHA SUBRAYA BHAT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 09 C 7329** |
| | ) | |
| **ACCENTURE, INC., ACCENTURE** | ) | **Magistrate Judge Finnegan** |
| **TECHNOLOGY LABS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Asha Subraya Bhat filed this pro se lawsuit charging her former employer, Defendant Accenture LLP (incorrectly sued as Accenture, Inc. and Accenture Technology Labs) with sex, race and national origin discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment on all claims. For the reasons set forth here, Defendant's motion is granted, and Plaintiff's motion is denied.

## BACKGROUND

**A.      Local Rule 56.1**

As mandated by Northern District of Illinois Local Rule 56.2, Defendant served Plaintiff with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment." (Doc. 109). The notice explains that Plaintiff was required to comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1 in responding to Defendant's motion for summary

judgment and statement of material facts, and sets out the consequences of failing to do so. *See Padilla v. Bailey*, No. 09 C 8068, 2011 WL 3045991, at *1 (N.D. Ill. July 25, 2011).

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994)). The Rule requires a party seeking summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue," and to present those facts in "short numbered paragraphs" with supporting record citations. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). *See also* L.R. 56.1. The opposing party must then file "a response to each numbered paragraph in the moving party's statement," also with supporting record citations. *Id.*

"Although courts must construe pro se pleadings liberally, . . . a plaintiff's pro se status does not absolve h[er] from complying with the federal and local procedural rules." *Padilla*, 2011 WL 3045991, at *2 (citing *McGee v. Bartow*, 593 F.3d 556, 566-67 (7th Cir. 2010); *Greer v. Board of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001)). Here, Plaintiff has submitted a Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment that predominantly serves as a statement of facts. Each enumerated "fact" is supported by numerous additional "facts" that are often of questionable relevance, lacking in admissible record support, speculative, or more appropriately viewed as argument. (Doc. 114). The same is true of Plaintiff's Response in Opposition to

Defendant's Motion for Summary Judgment, and two of her reply briefs. (Docs. 122, 128, 132).

Though Plaintiff's facts do not comply with Local Rule 56.1, the Court has done its best to sort through the briefs and trace Plaintiff's version of events, as well as her legal arguments and reasoning. Where Plaintiff has not directly responded to any of Defendant's enumerated facts as set forth in Local Rule 56.1, those facts have been deemed admitted. *See, e.g., Wilson v. Archer Daniels Midland Co.*, No. 09 C 4183, 2011 WL 2420259, at *1 n.1 (N.D. Ill. June 8, 2011) ("A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts being deemed admitted for purposes of summary judgment.") To the extent any fact is not addressed in this opinion, the Court has deemed it inadmissible and/or irrelevant. In that regard, Defendant's Motion to Strike Additional Facts Set Forth in Plaintiff's Reply in Support of Her Motion for Summary Judgment [Doc. 134] is denied as to any fact mentioned in this opinion, and granted as to all other facts.

**B.     Plaintiff's Objections to Documents and Affidavits**

Before turning to the relevant facts, the Court must first address Plaintiff's objection that Defendant improperly relies on (1) documents produced for the first time either on May 17, 2011, or in connection with summary judgment; and (2) inadmissible affidavits.

**1.     Documents**

Plaintiff objects to certain exhibits that are attached to the affidavits of Human Resources Representative Stacy Sikes and Plaintiff's career counselor, Craig Gettelman. She also takes issue with documents designated as Bates Nos. 00213-00222, which Defendant produced on May 17, 2011. Plaintiff claims that she never saw any of these

documents prior to receiving Defendant's motion for summary judgment, and that this late production "raises questions of authenticity." (Doc. 122, at 10). As a preliminary matter, the Court finds that the authors and/or recipients of the documents in question properly authenticated them with appropriate affidavits. *See Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).") (internal quotations omitted). Plaintiff's objection on authenticity grounds is thus overruled.

In addition, the Court has reviewed the documents and is satisfied that they do not contain any new information that in any way prejudiced Plaintiff's ability to pursue or respond to summary judgment. Defendant produced several of the challenged affidavit exhibits early in discovery, including exhibits B and C to Sikes's affidavit (Bates Nos. 00023 and 00006, respectively), and exhibit A to Gettelman's affidavit (Bates No. 00001). (Doc. 125, at 5). There is nothing improper or inadmissible about these documents.

With respect to the documents produced on May 17, 2011, most are simply duplicates of documents Defendant produced earlier in the litigation. For example, the document with Bates Nos. 00213-00214, also attached as exhibit C to Gettelman's affidavit, is a duplicate of an email previously produced as Bates Nos. 00019-00020. The document with Bates Nos. 00215-00217 is a duplicate of a performance review prepared by Julio Rivera, which Defendant produced to Plaintiff earlier in discovery as Bates Nos. 00195-00197. The only "new" information in the document is an email showing that Rivera sent a copy of the review to Gettelman on January 3, 2009, which is the same day he emailed it to Plaintiff. (Doc. 127-3, at 4-6; Doc. 127-5, at 2-4). Similarly, the document with Bates Nos. 00218-00221 is a duplicate of a performance review prepared by Joshua Kahn, which

Defendant produced to Plaintiff earlier in discovery as Bates Nos. 00198-00201.  The only "new" information in this document is an email showing that Kahn sent a copy of the review to Gettelman on September 15, 2008, three days before he emailed it to Plaintiff.  (*Id.* at 7-10, Doc. 127-6, at 2-5).  None of these documents is "new" in any material sense, or inadmissible.

Defendant concedes that the final document, Bates No. 00222 attached as exhibit E to Gettelman's affidavit, was never produced prior to May 17, 2011.  This document is Gettelman's summary of a conversation he had with Plaintiff on November 7, 2008 regarding her performance.  (*Id.* at 11).  Contrary to Plaintiff's assertion, this production (like all the others) occurred before Defendant filed its motion for summary judgment.  The Court finds that Defendant properly supplemented its document production in accordance with Rule 26(e), and there is no basis for striking Bates No. 00222.  *See, e.g., Jones v. National Council of Young Men's Christian Ass'ns of the U.S.*, No. 09 C 6437, 2011 WL 3273868, at *3 (N.D. Ill. July 28, 2011) ("[U]nder Federal Rule of Civil Procedure 26(e), each party has a duty to timely amend and/or supplement their responses to discovery if they obtain additional information or know that a response was incorrectly made."); *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 813 (7th Cir. 2006) ("It is well-settled that district courts enjoy broad discretion in controlling discovery.").  Notably, Plaintiff herself produced some 139 additional pages of documents on May 20, 2011.  (Doc. 127-2 ¶ 12).  Plaintiff's objections regarding Defendant's document production are all overruled.

### 2.     Affidavits

Plaintiff also objects to the admissibility of five affidavits.  She appears to suggest that Kahn, Rivera, Sikes, Gettelman and Recruiter Daniela Fuller cannot provide affidavits in this case either because they are not allowed to add information beyond what is contained in their written reviews of her, or because they did not participate directly in the decision to discharge her.  (Doc. 122, at 9).  This is incorrect.  Rule 56(c)(4) allows the use of affidavits and declarations to support or oppose summary judgment as long as they are made on personal knowledge.  *See Luster v. Illinois Dep't of Corrections*, __ F.3d __, 2011 WL 2857262, at *3 n.2 (7th Cir. 2011).  Plaintiff has presented no evidence demonstrating that the statements contained in the affidavits at issue here are not based on personal knowledge.  In addition, neither the Federal Rules nor case law prohibits the use of affidavits where the affiant has submitted a written review, or requires that affidavits come from persons directly involved in a termination decision.  It is worth noting that Plaintiff could have deposed all of these individuals during discovery, but she chose not to do so.  Plaintiff's objections to Defendant's affidavits are overruled.

### C.     Relevant Facts

### 1.     Plaintiff's Job Offer

Plaintiff is an Asian female of Indian national origin.  In late 2007, she applied on-line for an advertised Consultant position with Defendant's Technology Labs ("Tech Labs") division.  (Doc. 107 ¶ 7).  After a series of interviews, on January 15, 2008, Defendant offered Plaintiff a different position as an Analyst with Systems Integration & Technology Growth Platform, Consulting Workgroup, Consulting, Technology Labs – Analytics and

Insights. (*Id.* ¶ 8; Doc. 108-9, at 00084). Plaintiff told Defendant's Recruiter, Daniela Fuller, that she was not happy with the Analyst position or the compensation package offered to her, but she never mentioned her race, sex or national origin, either verbally or in writing. (*Id.* ¶¶ 9, 13). Rather, Plaintiff believed that she was qualified for the more senior Consultant position for which she had applied because she had worked as a Manager for over six years at her previous job and holds two Masters degrees from United States schools. (*Id.* ¶ 35; Doc. 114, at 22).[1]

In response to Plaintiff's concerns, Fuller contacted the Tech Labs managers who had evaluated her skills to see if they would reconsider hiring her at a Consultant level. Fuller also asked the hiring manager about a possible salary increase. The managers all confirmed that the offer was appropriate and non-negotiable based on Plaintiff's skills assessment interview. On January 22, 2008, Plaintiff accepted the offer, including a $15,000 hiring bonus, and began working as an Analyst. (Doc. 107 ¶¶ 8, 10, 11, 35). Senior Manager Craig Gettelman was designated as her career counselor, or mentor. (*Id.* ¶ 17).

### 2. Plaintiff's Performance

Employees in Tech Labs do not have permanent assignments but work on a project-by-project basis. Employees may be assigned to a project when a team requests their specific skill set, or they may ask to work in an available role. (*Id.* ¶ 14). The Human Resources department assists employees in finding projects, as do their career counselors. When an employee finishes a project and is not yet assigned to a new one, she is

---

[1] All of Plaintiff's facts are drawn from her briefs and exhibits in support of and in opposition to summary judgment, and her two-page declaration at Doc. 115.

considered to be "on the bench." The longer an employee is on the bench, the greater the indication that her skill sets are not in demand. Defendant tries to assign internal projects to employees while they are on the bench, but the goal is to have them working on paid client projects. (*Id.* ¶ 15).

### a. The My HealthWealth Project

Gettelman selected Plaintiff to work on her first main project, My HealthWealth, from April through August 2008. During that time, Plaintiff reported to Kanechi Nmani and Joshua Kahn; Kahn, in turn, reported to Gettelman. (*Id.* ¶¶ 16, 17). At the end of the project, Kahn prepared a Performance Feedback Form ("PFF") on Plaintiff's work.[2] He rated her as having met or exceeded expectations in seven of nine categories, noting that she "clearly demonstrated very strong analytical skills and was able to quickly learn on the job as needed," and "consistently drives to add value, seeking out opportunities to enhance existing or planned activities." (Doc. 108-22, at 00200).

At the same time, Kahn found that Plaintiff only "Partially Met Expectations" with respect to "Business Operator Results Rating" and "Established Personal Credibility with Clients and Others." Kahn explained:

> Due to Asha's deep expertise in analytics, she sometimes struggles to explain details of her work on a layperson level that is understandable by team members not trained in analytics. Her explanations are sometimes to[o] detailed, which draws clarity away from key messages in emails and status reports. Asha should try to think through key messages before putting them to paper to ensure they are not lost in explanation.
>
> One of Asha's strengths is her continuous drive to add value and improve upon her work; however, she sometimes pushes to[o] hard on an idea that for one reason or another is not integrated into the team's work. Choosing

---

[2] There is no evidence that Nmani ever evaluated Plaintiff's performance.

not to use an idea is not meant to be offensive, but is instead part of working collaboratively as a group. In future roles, Asha should look for opportunities to work more collaboratively with team members to embrace the constant sharing of ideas and constructive criticism that drives much of the success in Labs.

A key to the success of Labs is also the ability to meld technology with business objectives. Asha at times struggled to understand the value of business objectives and focused only on the technical aspects of the project. This le[d] to repeated discussions around rationale for decisions, such as why users were not asked directly to provide their net worth. By better understanding when business drives decisions over technology (and vice versa), Asha will be able to add even more value to her projects.

(*Id.*)

Plaintiff insists that Kahn's review "did not have a sound basis in reality." (Doc. 114, at 6). She denies having difficulty explaining details of her work to team members, noting that when Tech Labs Manager Ajay K. Easo interviewed her for a job on January 11, 2008, he stated that she had "[g]ood interpersonal skills" and was "[c]apable of articulating complex approaches in a meaningful way." (Doc. 117, at 18.03.169). Plaintiff also stresses that she helped prepare some simple and concise slides for a "Workshop" for prospective clients. (Doc. 114, at 7). With respect to collaboration and response to criticism, Plaintiff contends that her poor review in these areas "reflects more a desire of passive acceptance from Plaintiff than any real reason or deficiency towards the same." (*Id.*). Plaintiff notes that she "did what was asked for" on the project, which she believes demonstrates that she "did work collaboratively with others." She also suggests that the fact that she emailed Analyst Kevin Lee some project data reflects collaborative efforts on her part. (*Id.*; Doc. 117, at 73.01.584).

Plaintiff similarly takes issue with Kahn's assertion that she did not understand the value of business objectives, stressing that she was engaged to work in a technical role.

Defendant responds that there is no evidence that Plaintiff was supposed to ignore business objectives as they related to her technical role. (*Id.* at 8; Doc. 119, at 13). Plaintiff also claims that there was no actual client for the My HealthWealth project; rather, the business objectives were "just parameters set at product conception as to what the product's idea was supposed to achieve." (*Id.*). Defendant concedes that there was no outside client, but notes that an internal client, Accenture's Financial Services Operating Group, funded the project to develop a prototype to market. (Doc. 119, at 13).

In any event, on September 18, 2008, Kahn sent Plaintiff an email stating that he would be sending her a copy of her PFF to review before they discussed it. (Doc. 108-22). For some reason, Plaintiff was under the impression that supervisors were not allowed to prepare PFFs unless an employee asked for one. Plaintiff does not know where she got this idea, but believes it "could have been in the training that she had to undergo before starting on the job." (Doc. 122, at 3). Based on that impression, Plaintiff responded to the email as follows:

> I did not ask for a [performance review] because I do not think it is fair to get a one way assessment. Manager[s] are equally responsible to be evaluated [on] their ability to get expected work from individuals, manage their expectations from them and be assessed on it as the other way round. Since this is unsolicited I will ignore it.

(Doc. 107 ¶ 20). Apparently unsatisfied that this email adequately conveyed her viewpoint, Plaintiff also went to Kahn's floor and told him in a loud voice in an open area near his desk that she did not ask for the review and he had no business reviewing her.[3] (*Id.* ¶ 21).

---

[3] Plaintiff does not expressly deny any of these assertions, but she claims that "it is highly unlikely that any individual would 'loudly' in public discuss a bad review." (Doc. 122, at 4).

Finally, Plaintiff emailed Gettelman on September 18, 2008 saying that she "see[s] no point in" the PFF. (*Id.* ¶ 22; Doc. 108-17, at 00190).

Gettelman responded to Plaintiff's email by explaining that performance evaluations are "a mandatory part of our Accenture career development process" and are designed to "document project contributions, performance factors, strengths and areas for development." (Doc. 108-17, at 00190). He also offered to sit down and discuss this issue with Plaintiff. When Gettelman did meet with Plaintiff, she told him that she felt Kahn talked down to her and was disrespectful, but she never mentioned her sex, race or national origin. (Doc. 107 ¶¶ 23, 38). In her motion for summary judgment, Plaintiff now claims that Kahn complained about her "to ensure that he protects his turf for promotion." As Plaintiff sees it, her "race and stereotypes associated with it ensure that his motives are not questioned." (Doc. 114, at 6). Plaintiff also claims that she spoke with Kahn about the review on some unspecified date, and that although "we seemed to have come to a truce," Kahn did not "change or add anything to his review to reflect that." (Doc. 115 ¶ 6). It is undisputed that Plaintiff could have added her own comments to the PFF, but there is no evidence that she did so aside from her conclusory assertion to that effect. (Doc. 126, at 12).

### b.    The Consumerism Market Research Project

In September 2008, Senior Manager Julio Rivera selected Plaintiff to work on her second project, Consumerism Market Research for Highmark Inc., based on her resume. (Doc. 107 ¶¶ 24, 25). He assigned her to work on developing best practices, which apparently included the following aspects: "[s]ynthesize business insight needs and assess current capabilities"; "[d]istill leading marketing research practices relevant to client and

identifying opportunities for enhancements"; and "[d]efine a marketing research capability change plan." (*Id.* ¶ 26; Doc. 108-24, at 00195 (setting out "Role Description")).[4]

At some point during the project, Plaintiff was supposed to participate in making a presentation at the Highmark offices along with Rivera. On the day of the presentation, however, Steven Ramsey, the Accenture Partner assigned to the project, unexpectedly flew in and decided to participate in Plaintiff's place. Plaintiff became upset and started crying in the client's conference room. She was so loud, in fact, that a Highmark Account Executive who was sitting outside of the room heard the commotion and asked if anything was wrong. (*Id.* ¶ 28(2) n.6). Plaintiff admits that she "got upset" and "felt her emotions and frustrations coming out." She claims, however, that Ramsey "had an outburst" first by "discrediting her work right before going into the client meeting," and that she was only responding to it. (Doc. 114, at 13; Doc. 115 ¶ 3). She does not deny that the client heard her outburst, but maintains that she could not have foreseen that he might overhear because she "made sure she was in a closed room with no one else present" when she felt herself getting upset. (*Id.*). Plaintiff also notes that two different Highmark Directors, R. Todd Phillips and Gregory Horner, have no memory of her, either positive or negative. (*Id.*

---

[4]     Plaintiff argues that Rivera failed to articulate these objectives at the outset of the project, indicating "a desire to tailor objectives to prove bad performance." (Doc. 114, at 10). In response, Defendant points to Rivera's affidavit, in which he states that it was Plaintiff's responsibility to complete a Performance Objectives form when the project started, in accordance with conversations they had about her role, responsibilities and objectives. When Plaintiff failed to prepare these objectives, Rivera drafted them for her. (Doc. 119, at 49 ¶¶ 8-10). In one of her reply briefs, Plaintiff denies that Rivera told her to prepare Performance Objectives, (Doc. 132, at 3, 7), but she does not cite any record support for this assertion.

at 13-14). There is no evidence, however, that either Phillips or Horner was near the conference room at the time of Plaintiff's outburst.

Rivera ultimately decided to remove Plaintiff from the Consumerism project one or two weeks early. (Doc. 107 ¶ 32). After the project formally ended on October 30, 2008, Rivera spoke with Gettelman about Plaintiff's resistance to constructive feedback, the incident regarding her outburst at the client site, and her difficulties following instructions. (*Id.* ¶ 27). In that regard, Rivera had taken Plaintiff off the project a week or two early. (*Id.* ¶ 32). Gettelman contacted Stacy Sikes, the Human Resources Representative, for guidance. In an email dated November 4, 2008, Gettelman summarized Rivera's concerns as follows:

> 1) Asha consistently resisted attempts by project manager and project leadership to deliver to Asha constructive feedback. Asha would quickly raise a defensive posture and present counter arguments, failing to recognize or accept the areas for development.
>
> 2) Asha appeared to increasingly struggle with handling critical situations and sometimes failed to maintain utmost professionalism at the client site. This culminated in an incident at the client site when, after being given direct feedback and informed she would not be participating in the final client review, Asha became very emotional and lost her composure which caught the attention of the client.
>
> 3) The main development areas given to Asha included:
>
> - Needs to focus on being an active listener and follow instructions provided to produce work products that meet expectations.
>
> - Several times on the engagement Asha would be given sufficient direction and input to complete deliverables, only to have Asha go and change course based on [her] own individual thoughts or ideas.
>
> - The turnaround time for Asha to complete tasks, and the quality of the work outputs, did not meet the project leadership's expectations for someone at the experienced analyst level.

(Doc. 108-18, at 00213).  Gettelman also sent Sikes a copy of the concerns set forth in Kahn's PFF from the My HealthWealth project.  (*Id.*)

Sikes responded on November 6, 2008, stating that these performance issues were a "trend" that Plaintiff "need[s] to fix now."  Sikes confirmed that the company wanted Plaintiff to succeed, but noted that this would require her to "[b]e open to constructive feedback," "[l]isten better," and "[m]ake sure that she understands the directions, because if she isn't clear, then she won't be able to meet the expectations that were laid out."  Sikes stressed that the problems were "not something that can continue," and told Gettelman to remind Plaintiff that "she has to collaborate so we can meet the expectations of the client. Failure to work in this manner may mean she doesn't have long term career potential with Accenture."  (Doc. 108-12, at 00193).

Gettelman met with Plaintiff on November 7, 2008 to discuss these performance issues and the steps she could take to improve.  (Doc. 107 ¶ 30).  Plaintiff told Gettelman that she "had not done any of the things she was criticized for," and says she was "alarmed" that he "was not trying to understand my point of view."  (Doc. 114, at 16). Despite uncontradicted evidence that Gettelman contacted Sikes for guidance and received an email with comments and instructions in that regard, Plaintiff insists that "Gettelman never told me that project feedback or reviews were becoming a serious HR issue for me." (Doc. 115 ¶ 8).

Several months later, on January 3, 2009, Rivera completed a PFF on Plaintiff's performance.  He found that Plaintiff "Met Expectations" in one category, "Partially Met Expectations" in five categories, and "Did Not Meet Expectations" in four categories.  (Doc. 108-24, at 00196-00197).  Rivera agreed that Plaintiff was a hard worker with drive and

focus, and that she possessed academic intelligence and an ability to "self-educate." (*Id.* at 00197). He also noted, however, that she "tended to produce work products inconsistent with our discussions, my expectations, and consistently took too long to produce work products." He stated that to be successful at Accenture, Plaintiff would need to work on her professionalism, her acceptance of developmental feedback, and her verbal and written communications with others. (*Id.*)

Once again, Plaintiff argues that this PFF "did not have a basis in reality." (Doc. 114, at 11). She first objects to the delay between the end of the project and the date of the PFF, claiming that this somehow demonstrates that the review is not credible. She also notes that she sent Rivera an email on January 3, 2009 stating that the review contained "some factual errors" and that she would "take it with a grain of salt." (Doc. 117, at 25.01.323). Plaintiff next disputes that she had deficiencies in her written and verbal skills, again referring to her interview with Ajay K. Easo. She stresses that she was allowed to send some email messages to clients, write "minute interview meetings," and attend several client meetings aside from the one where she had an outburst, and claims that if her communication was truly poor, "then she would not have been allowed to do so." (Doc. 114, at 11, 12).

As for the timeliness of her work product, Plaintiff insists that she "could not have done her work earlier" because she did not have control over meeting or interview schedules that affected her work product. (*Id.* at 11). Defendant does not dispute that Plaintiff did not control such schedules, but Rivera explains that the delays on the Consumerism project "were due to [Plaintiff's] insistence on creating slides with content that she thought the client should have and not on what the client requested." (Doc. 119, at 50

¶ 13).  In that regard, Plaintiff acknowledges that Rivera asked her to delete slides without questioning his decision and offering explanations as to why she thought the slides were important.  Plaintiff maintains that this cannot qualify as "constructive criticism" of her work, and claims that she did ultimately stop the questions and explanations in her interactions with Rivera.  (Doc. 114, at 12, 13; Doc. 115 ¶ 2).

Plaintiff finally speculates that Accenture Partner Ramsey played a role in removing her from the Consumerism project, and either wrote or assisted in writing her PFF.  (*Id.* at 9, 11, 14).  Plaintiff provides no admissible evidence to establish either claim.  She posits, however, that Ramsey had some unspecified "motive" to "eliminate" her position in order to get credit for some of her work.  (*Id.* at 14, 15).  She also believes that both Ramsey and Rivera wanted to "keep pure client contact aspects of the project on 'American' turf away from Plaintiff who was not viewed as American."  (*Id.* at 10).  In support of this position, Plaintiff has submitted two research reports indicating that Asians are stereotyped as being high achievers but socially inept, and that Asian women in particular are stereotyped as being passive with limited language facility.  (*Id.* at 5-6) (citing Monica H. Lin, *et al.*, Stereotype Content Model Explains Prejudice for an Envied Outgroup: Scale of Anti-Asian American Stereotypes, PERSONALITY AND SOCIAL PSYCHOLOGY BULLETIN, Vol. 31, No. 1, at 34-47 (Jan. 2005); Advancing Asian Women in the Workplace: What Managers Need to Know, Catalyst Inc. Publication (2003)).  Plaintiff also claims that even though she herself was hired locally, Defendant's practice of outsourcing jobs creates a "master and slave like status quo between professionals of Asian Indian origin and those of US origin."  (*Id.* at 2) (citing "The 2010 Global Outsourcing 100," Special Advertising Section in Fortune Magazine).

Plaintiff says that she had a telephone meeting with Rivera on January 9, 2009 to discuss her review. At the end of the conversation, Rivera purportedly said: "We are alright with you then." This gave Plaintiff "the impression that things had got sorted out," but like Kahn, Rivera "did not add anything to his review to reflect that." (Doc. 115 ¶ 5).

### 3. Plaintiff's Job Complaints

As noted earlier, Plaintiff started complaining about her Analyst position before she even accepted the job, believing that she was qualified for a higher position. Plaintiff also complained that she was due for a raise in or around September 2008, but that some unidentified person told her at some unspecified time that the "rules changed." (Doc. 114, at 17; Doc. 122, at 4). Plaintiff apparently believed that she should have received a raise based on the terms of her job offer letter, which she characterizes as a contract entitling her to various benefits. (Doc. 128, at 2-3). As Defendant notes, however, the offer letter expressly stated that Plaintiff was hired "at will," and that she would be "eligible" for (as opposed to "entitled" to) a salary increase in September 2008 depending upon her performance, start date and "other compensation factors."[5] (Doc. 126, at 17; Doc. 108-9, at 00084-00085, 00086). Regardless, there is no evidence that Plaintiff complained about discrimination in connection with the raise.

In addition to these verbal complaints, Plaintiff also put some complaints in writing. For example, she prepared a Development Discussion Guide dated October 31, 2008 and discussed it with Gettelman around that time. This document purportedly set forth Plaintiff's concerns regarding discriminatory treatment, but she concedes that it did not

---

[5]     Though she invokes the concept of an employment contract, Plaintiff has not set forth any contract-based claims in this case.

mention discrimination based on sex, race or national origin.  (Doc. 107 ¶ 39).  Instead, Plaintiff complained only that "I believe I exceed and that consistently works against me," and that she wanted Defendant to "[r]ecognize that my level is working against me in my career development and help me find the solution for it."  (Doc. 108-6, at 6).  Plaintiff also prepared a Personal Engagement List which she characterizes as a complaint of discrimination.  Like the Development Discussion Guide, however, it never mentioned discrimination of any kind.  (Doc. 107 ¶¶ 40, 41).  Rather, Plaintiff expressed concern that "people" try to "pull other good people down," that senior management "takes a patronizing attitude," that she felt her "work is lost," and that the company's "brand and reputation is not more important than the respect you can get within it."  (Doc. 108-6, at 7-8).

Plaintiff also claims that Defendant discriminated against her in connection with an idea she wanted to develop using biometrics.  (Doc. 107 ¶ 52).  Plaintiff maintains that Senior Executive Cyrille Bataller, who works at Accenture's Labs in Sophia Antipolis France ("Sophia Labs"), expressed "interest in discussing [the] idea further," but that Defendant would not allow her to pursue it.  (Doc. 117, at 58.01.458).  She also says that she had a telephone conversation with Biometrics Analyst Lluis Font from Sophia Labs, who purportedly "acknowledged that the solution to an aspect of Biometrics projects in France came from Plaintiff's idea."  (Doc. 122, at 5; Doc. 128, at 2).  Defendant notes that the company had been working in the biometrics field since 2000, with a team in France actively working on a biometrics project since May 2008.  (Doc. 107 ¶ 54).  Plaintiff met with Michael Redding, Managing Director and former Director of Development for Tech Labs, to discuss her biometrics idea, but he did not believe that it was new or commercially viable.  (*Id.* ¶ 53; Doc. 108-25 ¶ 2).

Plaintiff disagrees with Redding's assessment, and she sent him an email to that effect on January 19, 2009. (Doc. 124, at 16.01.129). Specifically, Plaintiff claims that her idea pertained to end users going on the website, whereas Defendant's biometrics group was working primarily on "border control and ID cards." (Doc. 122, at 5; Doc. 124, at 22.01.141). Plaintiff further notes that she "formulated this idea in her own time," and claims that she "deserves the opportunity to execute her biometrics idea as injunctive relief." (Doc. 114, at 23-24). Defendant stresses that Plaintiff has no rights to her biometrics idea because she signed an Intellectual Property Agreement agreeing to transfer and assign to Accenture all rights to any materials she created while employed at Accenture. (Doc. 107 ¶ 55). Plaintiff finds it significant that the Agreement was open to amendment, but there is no evidence of any amendment in this case. (Doc. 122, at 6).

### 4.    Plaintiff's Termination

After her work on the Consumerism project ended in October 2008, Plaintiff was assigned to only small, internal projects. (Doc. 107 ¶ 34). Towards the end of that year, the Tech Labs group was directed to reduce its market development initiative budget due to an economic downturn. (*Id.* ¶ 56). Defendant claims that Redding approved Plaintiff's layoff at that time because there was no longer any demand for her skills and she was considered to be a "low performer." (*Id.* ¶¶ 57, 58; Doc. 108-25 ¶ 4). Plaintiff admits that she "was not on a Client project for the last couple months" of her employment. (Doc. 127-9, at 00007). She did work briefly on an eBay project from December 8 through 16, 2008, but the project manager, Rayid Ghani, told Gettelman that the project was not a good fit with Plaintiff's skills. (Doc. 108-13, at 00023). Plaintiff's other projects after October 2008

were internal and non-billable, such as "TSM Revenue" and "First Data RFP."[6] (Doc. 124, at 15.01.128, 19.01.136; Doc. 126, at 26).

Plaintiff learned of her termination on January 21, 2009. The termination was not effective until February 4, 2009 so that she could be employed a full year, receive the last payment of her hiring bonus, and be eligible for severance. Defendant did end up offering Plaintiff a severance package but she rejected it. (Doc. 107 ¶¶ 59, 61-62). On February 2, 2009, Plaintiff sent Stacy Sikes an email purportedly attaching a document titled "Year at the Labs," in which she wrote that "the fact that I was an age, gender and race that made me different in every way from the majority at Tech Labs made it even more difficult to make my point of view heard." On February 10, 2009, Plaintiff sent an email to Accenture's Chairman complaining about her termination. The email did not mention discrimination based on sex, race or national origin, but Plaintiff attached the "Year at the Labs" document. (Doc. 107 ¶ 63; Doc. 108-14, at 0007-0008; Doc. 117, at 67.01.570; Doc. 122, at 8; Doc. 124, at 1.03.003).

### 5. Plaintiff's Lawsuit

On August 5, 2009, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). In that document, Plaintiff alleged that:

> I began my employment with [Accenture] on or about February 4, 2008. My most recent position was Experienced Analyst. During my employment I complained about not being hired in a higher position in accordance with my experience. Subsequently I received poor performance reviews and on or about February 4, 2009 I was discharged.

---

[6] Plaintiff insists that these projects had paying clients, but the document she cites in no way demonstrates that any client in fact paid for the work she and others performed. (Doc. 136, at Re-11.01.085).

> I believe I have been discriminated against because of my sex, female, national origin, Indian, race Asian and that I was retaliated against for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 107 ¶ 5; Doc. 108-2). The EEOC issued a Dismissal and Notice of Rights less than three weeks later on August 21, 2009 (*id.* ¶ 6), and shortly thereafter, on November 23, 2009, Plaintiff filed this pro se federal lawsuit charging Defendant with discrimination and retaliation.

## DISCUSSION

**A.    Standard of Review**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). *See also Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, __ F.3d __, 2011 WL 2611303, at *5 (7th Cir. 2011). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In ruling on a motion for summary judgment, "[a] court's role is not to evaluate the weight of the evidence, to judge credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *National Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Where, as here, parties have filed cross-motions for summary judgment, the court must "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Othon v. LG Electronics USA, Inc.*, No. 08 C 878,

2009 WL 1748243, at *1 (N.D. Ill. June 18, 2009) (quoting *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005)).

Plaintiff argues that Defendant discriminated against her because of her race, sex and national origin when it (1) hired her as an Analyst; (2) gave her bad performance reviews; (3) terminated her employment; and (4) did not allow her to pursue a biometrics project. She also claims that she was fired in retaliation for complaining about unlawful discrimination. Defendant responds that the hiring claim is time-barred, and that the biometrics claim is beyond the scope of the EEOC charge. Defendant also contends that Plaintiff cannot establish a prima facie case of discrimination or retaliation, and has no evidence of pretext. The Court considers each argument in turn.

**B.    Timeliness of Discriminatory Hiring Claim**

Defendant argues that Plaintiff's claim of discriminatory hiring is time-barred and must be dismissed. "In Illinois, a complainant must file a charge with the EEOC within 300 days of the alleged discriminatory act and failure to do so renders the charge untimely." *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1121 n.4 (7th Cir. 2009) (quoting *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 395 (7th Cir. 1999)). In this case, Plaintiff received her allegedly discriminatory job offer on January 15, 2008, but she did not file an EEOC charge until August 5, 2009, more than 300 days later. This is fateful to her Title VII sex-based discriminatory hiring claim, and Defendant's motion for summary judgment on that claim is granted.

Plaintiff, however, also seeks to recover under § 1981, which covers claims of race and national origin discrimination. (Doc. 1 ¶ 9(d) and (e)). *See also Nance v. Rothwell*, No. 09 C 7733, 2011 WL 1770306, at *7 (N.D. Ill. May 9, 2011) (§ 1981 "reach[es] only race

22

discrimination, not sex . . . discrimination.")  Unlike Title VII, § 1981 "does not require a plaintiff to bring an EEOC charge before filing a claim in federal court."  *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007).  Thus, Plaintiff's claim of discriminatory hiring based on race and national origin is not time-barred and will not be dismissed on that basis.

## C.    Biometrics Claim

Defendant next argues that Plaintiff's biometrics claim is improper because it goes beyond the scope of her EEOC charge.  (Doc. 106, at 13).  "[A] Title VII plaintiff cannot bring claims in a federal lawsuit if they were not included in h[er] EEOC charge."  *Stinnett v. City of Chicago*, No. 08 C 709, 2009 WL 3229623, at *4 (N.D. Ill. Oct. 5, 2009) (citing *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009)), *aff'd*, 630 F.3d 645 (7th Cir. 2011).  An exception to this rule allows a plaintiff to "litigate claims which are like or reasonably related to the allegations in the [administrative] charge and growing out of such allegations."  *Id.* (quoting *Teal*, 559 F.3d at 691-92).  This is a liberal standard that is "satisfied if there is a reasonable relationship between the allegations in the charge and those in the complaint, and the claim in the complaint could reasonably be expected to be discovered in the course of the EEOC's investigation."  *Teal*, 559 F.3d at 692.

In this case, Plaintiff's EEOC charge alleges discrimination and retaliation based on her hiring, her performance reviews and her discharge.  (Doc. 107 ¶ 5; Doc. 108-2).  There is no mention of the biometrics project, and the Court is not convinced that it is reasonably related to these other claims.  The "general rule" is that "each separate act of discrimination must be set out in an EEOC charge before an action can be brought."  *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010).  As the Seventh Circuit recently explained, "[a]ny

additional act of discrimination can always be fit in and become part of an overall general pattern of discrimination," but this would "eviscerate" the purpose of an EEOC charge. *Id.* (claim for failure to promote to Director of Supported Living position was beyond the scope of EEOC charges alleging retaliation and failure to promote to Human Resources Director position). Plaintiff's biometrics claim is beyond the scope of her EEOC charge and cannot proceed.

Plaintiff's only response is that the Court should not only look to the EEOC charge, but should also consider the full content of her Intake Questionnaire. In that document, Plaintiff states that the "last straw" leading to her termination "seems to have been when I complained about how doors were shut on my face when I had expressed the desire to work and initiate a Biometrics project." (Doc. 122, at 2; Doc. 124, at 3.10.019). She blames the EEOC's intake personnel for failing to include the additional claim in the charge, and stresses that the Intake Questionnaire is attached to her federal complaint. (*Id.*)

The Seventh Circuit rejected a similar argument in *Novitsky v. American Consulting Engineers, L.L.C.*, 196 F.3d 699 (7th Cir. 1999). The plaintiff in *Novitsky* signed an EEOC charge alleging that the defendant fired her because of age and religious discrimination, and allowed other employees to make anti-Semitic remarks in the workplace. *Id.* at 701. In her intake questionnaire, the plaintiff also mentioned that the defendant did not accommodate her request for a day off to observe Yom Kippur, but the charge said nothing about this incident. *Id.* at 700, 701. The plaintiff later attempted to "avoid the limitations of the charge" by noting that it was drafted by "an EEOC staffer who read the questionnaire" but failed to include that allegation. *Id.* at 702. The Seventh Circuit found the argument unpersuasive, noting that "the charge is not the work of a faceless

24

bureaucrat, leaving victims of discrimination helpless to protect themselves. Complainants are free to draft and file charges on their own, or hire attorneys to do so, and a charge drafted by the EEOC's staff is not filed unless the complainant signs it – as [the plaintiff] did." *Id.*

The court also rejected the plaintiff's assertion that she should not be held to the terms of the EEOC charge because she "didn't pay much attention to what she was signing." *Id.* The court explained that "[p]eople are free to sign legal documents without reading them, but the documents are binding whether read or not." *Id.* The plaintiff "knew that the charge was separate from the intake questionnaire," and "whether or not she read or understood the charge, it was *her* charge." *Id.* at 702-03 (emphasis in original). The court thus affirmed summary judgment in favor of the defendant on the failure to accommodate claim.

Like the plaintiff in *Novitsky*, Plaintiff had an opportunity to read her charge, she signed it, and she knew that it was not the same thing as the Intake Questionnaire. Defendant's motion for summary judgment on Plaintiff's claim that she was discriminated against in connection with her biometrics idea is granted.[7]

## D.    Remaining Discrimination Claims

---

[7]    Even assuming that the biometrics claim was properly before the Court, Plaintiff has not presented any evidence that similarly situated male, non-Asian and/or non-Indian employees were allowed to pursue similar biometrics projects. Nor has she demonstrated that Michael Redding did not honestly believe that her idea was neither new nor commercially viable. There is thus no basis for Plaintiff's assertion that she "deserves the opportunity to execute her biometrics idea as injunctive relief." (Doc. 114, at 23-24). *See also Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 599-600 (7th Cir. 2010) (setting out requirements to withstand a summary judgment motion).

To prevail on her remaining discrimination claims under Title VII and § 1981, Plaintiff must present either direct or indirect evidence of discriminatory intent. *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 599 (7th Cir. 2010). *See also McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) ("[a]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical.") (quoting *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996)).

### 1. Direct Evidence

Under the direct method, Plaintiff must produce "either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, __ F.3d __, 2011 WL 3437028, at *4 (7th Cir. 2011). As the Seventh Circuit has explained, "[d]irect evidence is something close to an admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it 'uniquely reveals' the employer's intent to discriminate." *Id.* (citing *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005)). Circumstantial evidence of discrimination is "[m]ore common," and is established "through a longer chain of inferences." *Id.* (quoting *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008)). Such evidence may include: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (citing *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)).

Plaintiff's only direct evidence of discrimination is her assertion that another Tech Labs employee, Olutayo Oladunni, "made a comment in asking her to keep her voice down because she was a woman." (Doc. 114, at 22). It is not clear whether Oladunni actually made reference to Plaintiff's gender, or whether that was merely Plaintiff's interpretation of his comment. Regardless, there is no evidence that Oladunni played any role in Plaintiff's hiring, performance reviews or termination. His isolated statement, therefore, "cannot provide direct proof of [Defendant's] intention to discriminate." *Hozzian v. City of Chicago*, 585 F. Supp. 2d 1034, 1039 (N.D. Ill. 2008). *See also Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397 (7th Cir. 1997) (statement by a non-decisionmaker "does not provide the kind of 'smoking gun' evidence required for a direct inference of discriminatory intent.")

## 2. Indirect Evidence

In the absence of any direct evidence of discrimination, Plaintiff must proceed under the indirect method of proof. For purposes of the § 1981 discriminatory hiring claim, Plaintiff must show that: (1) she belongs to a racial minority; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *Norman-Nunnery v. Madison Area Technical College*, 625 F.3d 422, 431 (7th Cir. 2010). With respect to Plaintiff's claims of discriminatory reviews and termination, Plaintiff must show that: (1) she is a member of the protected classes; (2) she was performing well enough to meet her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in her protected classes were

treated more favorably. *Naik*, 627 F.3d at 599-600. If Plaintiff establishes all four of the elements of either prima facie case, then the burden shifts to Defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. If Defendant meets this burden, then Plaintiff must demonstrate that the reasons offered were pretextual. *Id.* at 600; *Norman-Nunnery*, 625 F.3d at 431-32.

Neither party specifically addresses the prima facie elements of Plaintiff's discriminatory hiring claim. With respect to her claims of discriminatory reviews and termination, there is no dispute that Plaintiff is a member of the protected classes. Defendant argues, however, that Plaintiff's prima facie case nonetheless fails because: (1) the PFFs do not constitute materially adverse employment actions; (2) Plaintiff was not meeting Defendant's legitimate job expectations at the time of her termination; and (3) Plaintiff has not identified any similarly situated employees outside her protected classes who were treated more favorably.

### a.    Prima Facie Case - Discriminatory Hiring

Before discussing the parties' arguments, the Court briefly notes that Plaintiff's prima facie case of discriminatory hiring is lacking. Plaintiff insists that she was entirely qualified for the Consultant position because she had worked as a Manager for over six years in her previous job, and because she holds two Masters degrees from United States schools. (Doc. 114, at 22). Yet Plaintiff has not explained how her specific skill sets, training and education satisfy the stated requirements of the Consultant position as set forth by Accenture. (Doc. 108-8). Plaintiff's conclusory assertion in that regard is not enough. *See, e.g., Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) (quoting *Nichols v. Southern Illinois Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007)) (the Seventh Circuit

28

has "repeatedly stated . . . that plaintiffs must offer more than mere self-serving appraisals."). Moreover, Plaintiff has not presented any evidence suggesting that after Defendant rejected her for the Consultant position, the company continued to seek applicants from persons with her same qualifications. As a result, Plaintiff has not stated a prima facie case of discriminatory hiring under § 1981.

### b. Prima Facie Case - Discriminatory Reviews and Discharge

### i. Adverse Action

Turning to Plaintiff's other discrimination claims, Defendant first contends that Plaintiff cannot demonstrate that she suffered an adverse employment action by virtue of receiving the two PFFs. (Doc. 106, at 7-8). To be actionable, an adverse action "must be materially adverse . . . meaning more than a 'mere inconvenience or an alteration of job responsibilities.'" *de la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008) (quoting *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001)). In that regard, "[a]n employee's unhappiness with her employer's conduct or decision is insufficient to support a claim under Title VII." *Id.* at 686. Rather, the employee must be able to show, at a minimum, "a quantitative or qualitative change in the terms or conditions of employment." *Id.* Thus, "negative performance evaluations, standing alone, are not cognizable adverse employment actions." *Id.* *See also Cole v. Illinois*, 562 F.3d 812, 817 (7th Cir. 2009) ("[A]lthough negative evaluations may have ultimately led to the termination, such a course was not an inevitable consequence of every reprimand" because "job-related criticism can prompt an employee to improve her performance, and thus lead to a new and more constructive employment relationship.") (internal quotations omitted).

The Court agrees that to the extent Plaintiff is seeking to recover because she received discriminatory performance evaluations, her claim must fail. Nevertheless, Plaintiff was ultimately discharged, which easily qualifies as an adverse employment action. *See, e.g., Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006) (termination "would unquestionably constitute an adverse employment action, as a member of the class of '[c]ases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished.'") (quoting *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002)). On the facts presented, the Court finds that Plaintiff has made a prima facie showing that she suffered an adverse employment action.

### ii.      Performance

Defendant claims that Plaintiff still cannot establish a prima facie case of discrimination because she was a "low performer" who was not meeting the company's legitimate job expectations. There is evidence to support this position. First, two different supervisors both indicated that Plaintiff did not respond well to constructive feedback. Joshua Kahn observed that Plaintiff "sometimes pushes to[o] hard on an idea that for one reason or another is not integrated into the team's work. Choosing not to use an idea is not meant to be offensive, but is instead part of working collaboratively as a group. In future roles, Asha should look for opportunities to . . . embrace the constant sharing of ideas and constructive criticism that drives much of the success in Labs." (Doc. 108-22, at 00200). Julio Rivera similarly told Gettelman that Plaintiff "consistently resisted attempts by project manager and project leadership to deliver to Asha constructive feedback. Asha would quickly raise a defensive posture and present counter arguments, failing to recognize or accept the areas for development." (Doc. 108-18, at 00213).

30

Kahn and Rivera also identified problems with Plaintiff's ability to: (1) communicate ideas "on a layperson level that is understandable by team members not trained in analytics"; (2) meld technology with business objectives; (3) be an active listener and "produce work products that meet expectations"; and (4) let go of ideas that she found important after they had been presented to, and rejected by, a client. (Doc. 108-22, at 00200; Doc. 108-18, at 00213; Doc. 118, at 4). In addition, Plaintiff exhibited unprofessional behavior when she told Kahn – in an email and again in person – that he had no business reviewing her work and that she would simply "ignore" his comments. (Doc. 107 ¶ 20). On another occasion, Plaintiff admittedly "got upset" and "felt her emotions and frustrations coming out" while in a client's conference room, and the client overheard her outburst. (Doc. 114, at 13).

Plaintiff disagrees with these assessments, but all she offers is her personal belief that she was performing at a high level. This is "insufficient to raise a genuine issue of material fact whether she was meeting [Defendant's] legitimate job expectations at the time of her termination." *Watts v. SBC Servs., Inc.*, No. 05 C 3111, 2006 WL 2224054, at *5 (N.D. Ill. July 31, 2006) (citing *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 531 (7th Cir. 2003)) (fact that employee believed her evaluations were unwarranted was not enough to establish that she was performing according to expectations). *Compare Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 737 (7th Cir. 1999) (plaintiff satisfied the second element of his prima facie case of race discrimination where his performance reviews "spoke in superlatives about the quality of [his] work," the company President gave him a "high recommendation" upon his termination, and he received annual pay raises and monetary bonuses).

Plaintiff has not met her burden of showing that she was meeting Defendant's legitimate expectations at the time of her discharge and, thus, she has failed to set forth a prima facie case of discrimination.

### iii.    Similarly Situated Employees

Defendant argues that Plaintiff also cannot establish the fourth element of her prima facie case because she has not identified any similarly situated male, non-Asian and/or non-Indian employees who were treated more favorably than her.  The Court agrees.  "The purpose of the 'similarly situated' comparator element is to ensure that all other variables are discounted so that an inference of unlawful intent would be reasonable."  *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 742 (7th Cir. 2011).  To be similarly situated, an employee must be "directly comparable in all material respects."  *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009).  In deciding whether an employee is directly comparable, the Court considers "all relevant factors, including whether the employee (1) held the same job description; (2) was subject to the same standards; (3) was subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications."  *Id.*

Plaintiff first points to Erin Maneri, a non-Asian and non-Indian woman, as a comparator.  Plaintiff testified at her deposition that she interacted with Maneri "a little bit" on the My HealthWealth project, and noticed that no one talked down to her.  Plaintiff also claims that "Maneri's experience was given more value than hers."  (Doc. 107 ¶¶ 43, 44).  Aside from these two observations, however, Plaintiff has not provided any evidence that she is similarly situated to Maneri in any material respect.  Plaintiff did not work with Maneri, and she has no knowledge regarding her job performance.  (*Id.* ¶ 45).  To the contrary,

Maneri only worked on the My HealthWealth project for a week or two before Plaintiff started on it, at which point she apparently handed the project over to Plaintiff. (*Id.* ¶¶ 47, 48). Nor has Plaintiff provided any evidence regarding Maneri's work experience, evaluations, or supervisors. (*Id.* ¶ 47). This is problematic because "[a] similarly situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff." *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004).

The only other comparator Plaintiff identifies is Varun Joshi, an Indian male who worked on the Consumerism project. Unlike Plaintiff, however, Joshi was a Consultant and not an Analyst. (Doc. 107 ¶¶ 49, 51). Plaintiff provides no further information about Joshi so there is no way to be sure that any alleged differences in how he was treated "cannot be attributed to other variables" besides race and national origin. *Silverman*, 637 F.3d at 742. Plaintiff has not identified any similarly situated male, non-Asian and/or non-Indian employees who were treated more favorably than her and, thus, she cannot state a prima facie case of discriminatory discharge.[8]

In the absence of a viable prima facie case, Plaintiff's discrimination claims fail as a matter of law.

---

[8] The Court notes that in response to Plaintiff's Motion to Compel [Doc. 57], it ordered Defendant to answer Plaintiff's Second Set of Interrogatories Nos. 1 and 19 by producing the name, sex, race and national origin of certain other Analysts, and by indicating whether any of those individuals had negative performance reviews. (Hearing of 1/13/11; Hearing of 1/19/11). Notwithstanding these rulings, Plaintiff decided to withdraw both interrogatories. (Doc. 63; Doc. 76).

### c.    Pretext

Even assuming that Plaintiff could establish her prima facie cases, Defendant would still be entitled to summary judgment because Plaintiff cannot prove that the company's reasons for hiring her as an Analyst and firing her are a pretext for discrimination. "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little*, 369 F.3d at 1012. In order to demonstrate pretext, Plaintiff "must show not only that [Defendant's] stated reasons for [hiring her as an Analyst and firing her] were dishonest or phony, but also that the true reason was based on prohibited discriminatory animus." *Benuzzi v. Board of Educ. of City of Chicago*, __ F.3d __, 2011 WL 2909904, at *11 (7th Cir. 2011). In the Seventh Circuit, "even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist." *Id.*

### 1.    Hiring Claim

Here, Defendant explains that it hired Plaintiff as an Analyst based on her skills assessment interview. Plaintiff may not have been satisfied with the position or the compensation, but she accepted the job and never indicated that she thought the offer was discriminatory. Notably, Plaintiff has not identified any non-Asian and/or non-Indian employees who had her same qualifications and experience and who were hired into the Consultant position.[9] There is simply no evidence that Defendant did not honestly believe

---

[9]    Plaintiff claims that Defendant hired Marion Feral (a Caucasian female) as a Consultant, even though Plaintiff had more experience based on a comparison of their resumes. (Doc. 114, at 22). Plaintiff cites to Feral's resume, which she designated as exhibit 58 (58.01.475) to her summary judgment materials. Exhibit 58, however, is a string of email messages between Plaintiff and Cyrille Bataller, and there is no page numbered 58.01.475. In any event, there is no evidence in the record as to when Feral was hired, the

Plaintiff was best suited for the Analyst position, or that the company offered her that job because of some discriminatory animus. Plaintiff's discriminatory hiring claim thus fails.

### 2. Discharge Claim

As for Plaintiff's discriminatory discharge claim, Defendant says that it terminated Plaintiff's employment for the legitimate, nondiscriminatory reason that she had demonstrated performance problems. As discussed earlier, Defendant produced evidence confirming that Kahn and Rivera believed, among other things, that Plaintiff was unreceptive to constructive feedback, had an unprofessional outburst that was overheard by a client, had trouble letting go of ideas, and did not adequately communicate complicated information. Rivera went so far as to remove Plaintiff from his Consumerism project one or two weeks early in October 2008. Kahn and Rivera discussed these performance issues with Gettelman, and Gettelman addressed them with Sikes. When the company needed to downsize due to the troubled economy, Sikes and Employee Relations Manager Shelly Amick recommended that Plaintiff be discharged due to her performance problems and extended tenure "on the bench." (Doc. 108-11 ¶ 13; Doc. 108-26 ¶¶ 4, 6). Redding approved this recommendation. (Doc. 108-25 ¶ 4).

As noted, Plaintiff strenuously disagrees with her performance assessments. She claims that the reviews are all pretextual because the negative feedback stems solely from

basis for her hire, or the exact nature of her employment background. Defendant claims that Feral had specialized training and experience in biometrics, and that she was assigned to work on an existing project out of Sophia Labs. (Doc. 119, at 37). Plaintiff denies this, but she cites no admissible evidence refuting Feral's biometrics expertise. In addition, Feral testified at her deposition that she spent a month in July 2008 working on "the feasibility of an idea they already had – they had in the Sophia Lab." (Doc. 132, at 4; Doc. 117, Ex. 78, at 9). On these facts, Plaintiff has not met her burden of showing that Feral is a proper comparator.

the fact that she does not fit the stereotype that Asian/Indian women are passive. Plaintiff appears to be arguing that Defendant disliked her assertive style and, thus, tried to push her into a more stereotypical role by criticizing her language facility and behavior. As she sees it, Defendant's practice of outsourcing jobs creates a "master and slave like status quo between professionals of Asian Indian origin and those of US origin." This resulted in supervisors like Kahn and Rivera "minimiz[ing]" Plaintiff's "tangible good work" and focusing instead on "stereotyped negative feedback" so they could take credit for her work and keep her in a subordinate role. (Doc. 114, at 5-6, 10, 15).

Plaintiff's assertion that Defendant only focused on the negative aspects of her performance is belied by the PFFs, both of which include positive assessments as well. Indeed, Kahn's review is largely positive in that he rated her as having met or exceeded expectations in seven of nine categories. He also noted that Plaintiff "clearly demonstrated very strong analytical skills and was able to quickly learn on the job as needed," and "consistently drives to add value, seeking out opportunities to enhance existing or planned activities." (Doc. 108-22, at 00200). Rivera, similarly, agreed that Plaintiff was a hard worker with drive and focus, and that she possessed academic intelligence and an ability to "self-educate." (Doc. 108-24, at 00197). *See also Sanford v. Walgreen Co.*, No. 08 C 6325, 2010 WL 380907, at *8 (N.D. Ill. Jan. 27, 2010) (no pretext where "the same performance review [the plaintiff] believes is discriminatory included ratings of 'above average' in four categories and praised [him] for serving as a 'team player.'")

In support of her claims regarding stereotyping and outsourcing, Plaintiff directs the Court to three research reports addressing these issues, one of which was published in a special advertising section of Fortune Magazine. These reports have nothing to do with

Accenture or any of its employees, and they are not evidence that Defendant discriminated against Plaintiff. Significantly, Plaintiff does not allege that Kahn, Rivera or anyone else at Accenture made discriminatory or stereotypical statements about race, sex or national origin. (Doc. 107 ¶ 42). All Plaintiff has is her personal belief that her performance was above reproach, and her speculation that any criticism must therefore be motivated by discrimination. This is not enough. *See Thakkar v. Station Operators Inc.*, 697 F. Supp. 2d 908, 922 (N.D. Ill. 2010) (quoting *Visser v. Packer Engineering Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)) ("Discrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits speculating about the defendant's motives.")

Plaintiff finds it significant that Ajay Easo, another Tech Labs Manager, interviewed her and thought that she had "[g]ood interpersonal skills" and was "[c]apable of articulating complex approaches in a meaningful way." (Doc. 117, at 18.03.169). Easo, however, was not involved in the termination decision and never worked with Plaintiff on any specific projects. Since the honest belief rule looks only at the motivation of the decisionmakers, Easo's opinion is irrelevant and cannot defeat summary judgment. *Little*, 369 F.3d at 1012.

Plaintiff also argues that Rivera's PFF is pretextual because the Consumerism project ended in late October 2008, but he did not submit her review until January 2009. This argument is unavailing. There is uncontroverted evidence that Rivera gave Plaintiff feedback on her work during the course of the project.[10] (Doc. 107 ¶ 33; Doc. 119, at 50 ¶ 11). In addition, Rivera spoke with Gettelman about Plaintiff's performance sometime

---

[10]      Plaintiff denies this fact without citing to any record citation. (Doc. 132, at 7).

between October 30, when the project ended, and November 4, 2008. Gettelman, in turn, contacted Sikes about the issue on November 4, 2008. Upon receiving Sikes's response, Gettelman met with Plaintiff on November 7, 2008 to discuss ways she could improve her performance. The mere fact that Rivera prepared Plaintiff's PFF in January 2009 in no way demonstrates that he acted with a discriminatory motive.

Plaintiff finally disputes that there was no demand for her skills at the time she was discharged. She admits that she "was not on a Client project for the last couple months" of her employment, (Doc. 127-9, at 00007), but she stresses that she continued to work on an eBay project and other internal projects. In reality, Plaintiff spent little more than a week on the eBay project because the project manager did not think her skills were a good fit. In addition, though Defendant tries to assign internal projects to employees on the bench, the goal is to have them working on paid assignments. (Doc. 107 ¶ 15).

Significantly, Plaintiff was not the only employee discharged as part of Defendant's cost-cutting measures. Defendant also laid off a Caucasian female (Analyst Sara R.) and a Caucasian male (Analyst Steven M.). (*Id.* ¶ 60). There is no evidence that either of these individuals had performance issues like Plaintiff when they were selected for layoff. Plaintiff takes issue with this evidence as well, arguing that "[t]he fact that Accenture's financials shows a profit for the year belies the necessity of dismissal of a low paid and low level Analyst." (Doc. 114, at 19). The Seventh Circuit has made clear, however, that "when an employer articulates a plausible, legal reason for discharging the plaintiff, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Silverman*, 637 F.3d at 738 (internal quotations omitted). *See also Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697

(7th Cir. 2006) (courts "do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined."). As explained, Plaintiff has failed to demonstrate that she was discharged for any reason other than her performance problems and "benched" status, much less that the real reason was unlawful discrimination. Defendant's motion for summary judgment on Plaintiff's discrimination claims is granted, and Plaintiff's corresponding motion is denied.

## E.    Retaliation Claims

As with her discrimination claims, Plaintiff may prove her Title VII and § 1981 retaliation claims by using either the direct or indirect methods. *Benuzzi*, __ F.3d __, 2011 WL 2909904, at *12. To establish a prima facie case of retaliation by the direct method of proof, Plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) the former caused the latter. *Burnell v. Gates Rubber Co.*, __ F.3d __, 2011 WL 3132470, at *4 (7th Cir. 2011). Under the indirect method of proof, Plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she performed her job according to Defendant's expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated employee. *Vance v. Ball State Univ.*, __ F.3d __, 2011 WL 2162900, at *9 (7th Cir. 2011). Under either method of proof, Plaintiff's claim must fail.

Plaintiff admits that prior to her termination, she never complained of discrimination based on race, sex or national origin. She did prepare two documents she now characterizes as complaints of discrimination, but neither says anything of the sort. For example, Plaintiff's Development Discussion Guide recorded her belief that she "exceed[s] and that consistently works against me," and stated that she wanted Defendant to

"[r]ecognize that my level is working against me in my career development and help me find the solution for it."  (Doc. 108-6, at 6).  Plaintiff's Personal Engagement List, similarly, stated only that "people" try to "pull other good people down," that senior management "takes a patronizing attitude," that Plaintiff felt her "work is lost," and that the company's "brand and reputation is not more important than the respect you can get within it."  (Doc. 108-6, at 7-8).

Plaintiff also sent an email to Redding on January 19, 2009 which she claims amounted to a "complain[t] about how doors were shut on my face when I had expressed the desire to work and initiate a Biometrics project."  (Doc. 124, at 3.10.019).  In fact, that email says nothing about Plaintiff's purported belief that "doors were shut" to her, much less about discrimination in that regard.  Plaintiff merely thanks Redding for meeting with her, acknowledges his "skepticism about the project as a new business," expresses her "modest opinion" that the project could actually "be the most successful," and describes her efforts to get the project off the ground.  (Doc. 124, at 16.01.129).

The Seventh Circuit has explained that "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create an inference is insufficient" to show protected activity.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  *See also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (a report of discrimination "must include a complaint of national origin [or race or sex] discrimination or sufficient facts to raise that inference.")  In this case, Plaintiff never said anything about discrimination at all, and her indirect comments in no way raise an inference that she was complaining of race, sex or national origin discrimination.  *See Sitar v. Indiana Dep't of*

*Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (plaintiff's complaint that she "felt picked on" did not "invoke any action protected by Title VII.")

Plaintiff contends that even though she complained of discrimination only "indirectly," somehow "it was understood that she felt discriminated against." (Doc. 114, at 31; Doc. 122, at 5). She also posits that "fear of consequences may have prevented Plaintiff from directly accusing of discrimination on each matter." (*Id.* at 17, 18, 25). These arguments are unavailing. Plaintiff's unsupported belief that Defendant "understood" what she meant by her general complaints is unfounded and inadequate to demonstrate that she engaged in protected activity. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) ("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.") Nor has Plaintiff identified any statements or actions by Defendant that may have prevented her from making direct complaints.

Plaintiff did mention her race, sex and national origin in a document she purportedly attached to (1) an email she sent to Stacy Sikes on February 2, 2009, and (2) an email she sent to Defendant's Chairman on February 10, 2009. Plaintiff first learned of the decision to terminate her employment nearly two weeks earlier, however, on January 21, 2009. Thus, there could be no link between the adverse action and Plaintiff's subsequent complaint. Plaintiff also finds it suspicious that she was discharged just two days after sending an email to Redding on January 19, 2009. But as noted, that email says nothing about discrimination and cannot serve as evidence of Redding's retaliatory motive.

Plaintiff attempts to avoid this result by noting that in February 2009, Erin R. Lido from the "Shell" project team told her that she could not work on that project because her

bill code was too expensive. (Doc. 124, at 10.13.107). Based on that information, Plaintiff speculates that "HR and Senior Management," who were responsible for setting bill codes, set her code too high as "retaliatory action to prevent Plaintiff from being considered for projects so Defendants could make a case to fire Plaintiff." (Doc. 122, at 6). There is no evidence, however, that Plaintiff's bill code was in fact too high, or that Defendant changed the code anytime after hiring her, much less in response to her "indirect" complaints of discrimination.

Plaintiff also speculates that Stacy Sikes may have retaliated against her because she "had the ability to change and input Plaintiff's time." (*Id.* at 7). Specifically, Plaintiff failed to submit her time for February 1 through 4, 2009 before her access to Defendant's computer system terminated, so Sikes offered to input the time for her. (Doc. 126, at 28). Again, Plaintiff presents no evidence that Sikes actually manipulated her hours, or that she was motivated to do so based on Plaintiff's indirect complaints of discrimination. Plaintiff's "own unsubstantiated speculation" on these matters, standing alone, "cannot defeat a summary judgment motion." *Delapaz*, 634 F.3d at 901.

Defendant's motion for summary judgment on Plaintiff's retaliation claims is granted, and Plaintiff's corresponding motion is denied.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment [Doc. 105] is granted, and Plaintiff's Motion for Summary Judgment [Doc. 113] is denied. Defendant's Motion to Strike Additional Facts Set Forth in Plaintiff's Reply in Support of Her Motion for Summary Judgment [Doc. 134] is denied as to any fact mentioned in this opinion, and granted as to all other facts.

ENTER:

Dated: August 23, 2011

SHEILA FINNEGAN
United States Magistrate Judge